**MINNEHOMA FINANCIAL COMPANY, a Delaware corporation, Plaintiff,**

v.

**C. J. VAN OOSTEN, d/b/a Van's Montana Trailer Mart, Defendant.**

Civ. No. 305.

United States District Court
D. Montana,
Billings Division.

Sept. 29, 1961

**202**

Coleman, Lamey & Crowley, Billings, Mont., for plaintiff.

Burke, Hibbs & Sweeney, Billings, Mont., for defendant.

JAMESON, District Judge.

Plaintiff, a Delaware corporation with its principal place of business at Tulsa, Oklahoma, brought this action against defendant, a Montana corporation, to recover on guaranties of conditional sales contracts assigned to plaintiff by defendant and trust receipts executed by defendant. Plaintiff has not qualified to do business in Montana under the provisions of Sections 15–1701 to 15–1713, R.C.M.1947,[1] relating to foreign corporations doing business in the State of Montana. The sole question presented is whether, by reason of plaintiff's failure to comply with these statutory provisions, the contracts between plaintiff and defendant are enforceable in Montana. The case was submitted on an agreed statement of facts, and the parties have agreed upon the amounts due plaintiff if the contracts are enforceable.

Plaintiff was engaged in financing mobile homes, including homes manufactured by Spartan Aircraft Company of Tulsa, Oklahoma. Defendant, a retail mobile home dealer in Billings, Montana, sold homes manufactured by Spartan and was an authorized dealer for Spartan.

Mobile homes purchased by defendant from Spartan were invoiced by Spartan at Tulsa to plaintiff, and then delivered to defendant on trust receipts executed by defendant prior to the deliveries. The trust receipts, signed by defendant in Montana in blank in advance, were mailed to plaintiff at Tulsa, where they were filled in by plaintiff at the time of the transactions.

When defendant sold mobile homes on conditional sales contracts, the contracts were purchased by plaintiff through assignment from defendant. The conditional sales contracts were executed by defendant and the purchasers in Montana. The assignments were likewise executed by defendant in Montana and mailed to plaintiff in Tulsa, for acceptance or rejection. All monies advanced by plaintiff in connection with the trust receipt and conditional sales transactions were transmitted to the defendant or Spartan, as the case may be, by mail from Tulsa. The forms of conditional sales contracts and trust receipts were furnished by plaintiff to defendant.

An agreement "covering purchase of conditional and time sales contracts", dated May 23, 1956, was executed by defendant in Montana and sent to Tulsa for execution by plaintiff there, the agreement reciting that it "was made and entered into in Tulsa, Oklahoma". Defendant, at the request of plaintiff, in accordance with the terms of paragraph 10 of this agreement, repossessed in Montana mobile homes referred to in two counts of plaintiff's complaint.

The business contacts of the plaintiff in the State of Montana, or with residents

1. Section 15–1703, R.C.M.1947, provides: "*Contracts void if made before compliance with act.* If any foreign corporation shall attempt or commence to do business in this state without having first filed said statement, certificate, and consent, required by this act, or without complying with any or all of the laws of Montana relating to the payment of fees or licenses, no contract made by such corporation, or any agent or agents thereof, during said time, shall be enforceable by the corporation until the foregoing provisions have been complied with."

of Montana, other than as hereinbefore enumerated, are confined to the floor planning and financing of other Spartan dealers in the State of Montana under arrangements identical with those it had with the defendant, together with an occasional checking of the inventory of these dealers by an independent contractor on behalf of plaintiff, as requested by plaintiff by telegram or mail, and, on one occasion in 1959, by a representative of plaintiff who visited Montana for that specific purpose.

The parties have agreed upon the amount due plaintiff on each of six counts in plaintiff's complaint,[2] and that judgment may be entered for the respective amounts in the event plaintiff prevails in this action.

Defendant contends that plaintiff's failure to comply with Section 15–1701 et seq., R.C.M.1947, renders the various contracts between plaintiff and defendant void and unenforceable. Plaintiff contends that it was not "doing business" in the State of Montana within the meaning of these statutory provisions; and that if so, the transactions constituted interstate commerce and plaintiff was not accordingly required to qualify to do business in Montana.

■ Where it is established that a foreign corporation has been "doing business" within the State of Montana without complying with the provisions of section 15–1701 et seq. with respect to qualification, payment of license fees, and filing annual reports, the corporation is not entitled to enforce any contracts made during the period of noncompliance, notwithstanding a later compliance with the statute. This rule is applicable in the federal as well as state courts in Montana.[3]

■■ A determination of what constitutes doing business within the state depends primarily upon state law.[4] In Montana the meaning of the term "doing business in the state" is the same for the regulation of corporations as for service of process, and the same tests are applied in determining whether a corporation is doing business in the state.[5]

The meaning of the phrase "doing business in the state" has been considered by the Montana Supreme Court in a number of decisions and by this court in two prior decisions. Three of the state court cases [6] and the first of the two cases in this court [7] were reviewed at some length in Graham and Ross Mercantile Co. v. Sprout, Waldron & Co., D.C.D. Mont.1959, 174 F.Supp. 551. It would serve no useful purpose to repeat that discussion here.

**2.** It was agreed that if plaintiff prevails, it is entitled to judgment for the following sums: First count—$5,224.57, second count—$2,855.70, third count—$2,541.00, fourth count—$2,310.00, fifth count—$5,689.95, and sixth count—$4,054.56 (interest having been computed in each instance to September 6, 1961), together with reasonable attorney fees on each count, computed in accordance with Rule 43, Rules of Practice of the District Court of the Thirteenth Judicial District of the State of Montana.

**3.** See Hutterian Brethren of Wolf Creek v. Haas, D.C.D.Mont.1953, 116 F.Supp. 37; Rock-Ola Manufacturing Corporation v. Wertz, 4 Cir., 1957, 249 F.2d 813, 814, and cases there cited.

**4.** Kansas City Structural Steel Co. v. State of Arkansas, for Use and Benefit of Ashley County, 1925, 269 U.S. 148, 150, 46 S.Ct. 59, 60, 70 L.Ed. 204;

Graham and Ross Mercantile Co. v. Sprout, Waldron & Co., D.C.D.Mont.1959, 174 F.Supp. 551, 553.

**5.** State ex rel. American Laundry Machinery Co. v. Second Judicial District Court, 1934, 98 Mont. 278, 41 P.2d 26, 29, certiorari denied 295 U.S. 744, 55 S.Ct. 656, 79 L.Ed. 1690. As defendant correctly states in his brief, as a general rule in other jurisdictions a lesser degree of "doing business" is required for valid service of process than for application of state regulatory statutes.

**6.** General Fire Extinguisher Co. v. Northwestern Auto Supply Co., 1922, 65 Mont. 371, 211 P. 308; State ex rel. American Laundry Machinery Co. v. Second Judicial District Court, supra; State ex rel. Taylor Laundry Co. v. District Court, 1936, 102 Mont. 274, 57 P.2d 772, 113 A.L.R. 1.

**7.** Clapper Motor Co. v. Robinson Motor Co., D.C.D.Mont.1954, 119 F.Supp. 79.

Two additional Montana cases are pertinent. In Uihlein v. Caplice Commercial Co., 1909, 39 Mont. 327, 102 P. 564, 566, the court held that the Schlitz Brewing Company was not doing business in Montana, although it owned real estate and maintained an office in Montana to "see the trade, * * * make sales on the basis of prices and terms furnished by the home office, his terms to be approved and corroborated by the home office". Beer was shipped to Montana f. o. b. Milwaukee. In Caterpillar Tractor Co. v. Johnson, 1935, 99 Mont. 269, 43 P.2d 670, 671, it was stipulated that Caterpillar had "done business in the state of Montana for many years, but (had) never complied with the laws of Montana relative to foreign corporations doing business in this state; all of its business having been done through dealers in this state". It was contended that plaintiff could not maintain its action since it had never qualified to do business in the state. The court rejected this contention, holding that Caterpillar was not "doing business" in the state.[8]

Defendant relies upon two Montana cases, State ex rel. Taylor Laundry Co. v. Second Judicial District Court, supra, and State ex rel. Schmidt v. District Court, 1940, 111 Mont. 16, 105 P.2d 677. In my opinion, both cases are clearly distinguishable. In the Taylor Laundry Co. case the corporation had sold laundry machinery directly, through agents and representatives who travelled throughout the state soliciting business, selling, supervising installation, servicing machines, accepting used machines as payment on the purchase price of new sales, and making adjustments. The court held that, while solicitation by agents of sales of merchandise to be shipped into the state does not constitute doing business, the added activity of adjusting, inspecting, trading and repairing was sufficient to constitute a continuous course of doing business within the state. Even here, the court said that "this case may be said to be close * * *." 57 P.2d at page

776. In the Schmidt case a foreign corporation had qualified to do business in Montana and appointed a statutory agent, who later died and was not replaced. It had never withdrawn its authority to do business in Montana. An employee of the corporation at the time the action was instituted had been selling its products in Montana for about four years. He attended to company business, making sales, keeping the accounts of customers, making collections and adjusting complaints for damaged goods. The court found these facts sufficient to show that the company was engaged in business in Montana and that this employee was its managing agent for service of process. It will be noted that in both the Taylor and Schmidt cases the foreign corporations dealt directly with customers, and rather extensively, through agents in Montana. Their activities were not limited, as here and in the Caterpillar case, to transactions through dealers.

■ Although none of the Montana cases is precisely in point, it is clear that plaintiff's activities and contacts fall far short of what is required to constitute "doing business in the state", as this phrase has been construed by the Montana Supreme Court with respect both to regulation of corporations and service of process. There is no evidence that plaintiff had any office, place of business or resident agents or employees in the state. It did not deal directly with any customers or purchasers, but solely with dealers. This business was conducted by mail pursuant to an agreement expressly reciting that "it was made and entered into at Tulsa, Oklahoma". The assignments of the conditional sales contracts were subject to plaintiff's acceptance or rejection in Tulsa. The trust receipts signed by defendant in blank were mailed to plaintiff in Tulsa, where they were completed by plaintiff, the receipts reciting "City Tulsa, State Oklahoma". The inventories of dealers in Montana were checked by an independent contractor pursuant to tel-

---

8. See also Dover Lumber Co. v. Whitcomb, 1917, 54 Mont. 141, 168 P. 947, 950.

egraphic or mail request, except upon one occasion when a representative of plaintiff visited Montana for that purpose. Insofar as disclosed by the record, this is the only activity by any representative of plaintiff in Montana. This isolated visit could not be construed as doing business in the state.

■ I find no merit in defendant's contention that it was acting as an "agent" of plaintiff. Defendant relies specifically upon paragraphs 7 and 10 of the agreement of May 23, 1956. Paragraph 7 simply provides for a "dealer's reserve account", the amount to be determined by plaintiff (but not exceeding 5% of the retail cash sale price) against which plaintiff could charge sums owed by defendant, and providing further that plaintiff at its option could credit a portion of the finance charges to defendant, the balance of any credit in the account to be paid defendant when all contracts were paid in full. Defendant refers to this arrangement as a "dividend" for the defendant. Whatever the terminology, it was not sufficient to convert the agreement for the "purchase of conditional sales and time contracts" into an agency agreement. Paragraph 10 provides that the defendant, at plaintiff's request, but at defendant's expense and risk, will repossess any mobile home where the contract is in default. The same paragraph specifically provides that neither the making of the request nor the repossession shall constitute a waiver of defendant's guaranty nor of its obligation to repurchase the contract. These two paragraphs in themselves are inconsistent with a principal-agent relationship. Viewing the agreement in its entirety, it is clear that it was a contract setting forth the terms and conditions under which plaintiff would purchase conditional sales contracts from the defendant. It was specifically provided in the first paragraph that defendant was not obligated to sell contracts to plaintiff and plaintiff was not obligated to purchase any contracts which might be offered by defendant. Defendant was clearly an independent contractor and not an agent.

The agency theory upon which defendant relies was expressly rejected by the Court of Appeals for the Fourth Circuit in Rock-Ola Manufacturing Corporation v. Wertz, 4 Cir., 1957, 249 F.2d 813. Plaintiff, a Delaware corporation, manufactured and sold coin operated phonographs and accessories. It had agreements with distributors throughout the United States, including defendant Wertz Music Supply, a Virginia concern. Wertz sold the "juke boxes" in Virginia to operators on conditional sales agreements, which it assigned to plaintiff. The latter would accept the assignments at its Chicago office and credit the account of Wertz, who remained secondarily liable as assignor. If an operator's account became overdue, he would be notified by Wertz on Rock-Ola's forms, of the obligation and would be directed to remit thereafter to the manufacturer. On several occasions, when delinquencies accumulated, Rock-Ola's representative visited the operators in an effort to bring about a reduction in their debts. On other occasions the plaintiff sent a field engineer to Virginia to instruct Wertz's repairmen in the repair of the Rock-Ola machines. In reversing the trial court's finding that Wertz was Rock-Ola's agent, the court said:

> "Rock-Ola's practice of taking assignments of conditional sales contracts from Wertz tended * * * away from agency rather than toward it. The assignment of the conditional sales contracts left Wertz with a secondary liability to Rock-Ola. This is a debtor-creditor relationship rather than one of agency. As the Judge correctly observed: '* * * by reason of his (Wertz's) guaranty of the contracts, his personal liability was greater than that of an ordinary agency relationship.'"

As for the question of whether Rock-Ola was doing business within the State of Virginia, the court went on to say:

> "It is plain on this record that while Wertz assigned the conditional sales contracts in Virginia, they

were accepted by Rock-Ola in Chicago. The acceptance of such assignments, even when done in the ordinary course of the foreign corporation's business, is not an act of 'doing business' within the qualification requirements. Sending agents into the state to collect debts owing to the assignee, also does not constitute doing business, the collection being incidental to the assignment, the acceptance of which was not the doing of business." 249 F.2d at page 817.

█ It will be noted that the activities of Rock-Ola in Virginia were even greater than those of plaintiff here. I find the reasoning and result of that case persuasive and in accord with the Montana cases. It is also in accord with the general rule in other jurisdictions that the purchase of commercial paper from distributors or dealers and financing "floor plans" through trust receipts do not constitute doing business in the state where the distributor or dealer operates, where the transactions are received and approved by the finance company outside the state and the company does not maintain an office, place of business, or agents or other representatives in the state.[9]

Defendant urges the court to adopt the so-called "liberal view" of what constitutes doing business in the state. Defendant relies primarily upon International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, where the court held that defendant's "operations established sufficient contact or ties with the state of the forum to make it reasonable and just according to our traditional conception of fair play and substantial justice to permit the

state to enforce the obligations which appellant has incurred there". 326 U.S. at page 320, 66 S.Ct. at page 160. The effect of this and similar cases cited by defendant was considered in detail by this court in Graham and Ross Mercantile Co. v. Sprout, Waldron & Co., supra.

With particular reference to the instant case, it should be noted first that International Shoe Co. related to service of process and not to the denial of the right to sue in the state by reason of failure to comply with regulatory statutes. Even if the Montana court were to adopt a more liberal view with respect to service of process, thus enlarging the right to enforce obligations in the Montana courts, we cannot presume that it would similarly extend this rule to denying the right of foreign corporations to enforce obligations in Montana because of failure to comply with the regulatory statutes. As counsel for defendant have recognized in their brief, in most jurisdictions the requirements are less strict with respect to process statutes. Montana has applied the stricter tests as to both statutes. In the second place, International Shoe simply enlarges the "enclave" of power of the states. It is only when it is determined that service is valid under state law that the question of the state's power under the Constitution becomes important.[10] Under the present Montana authorities plaintiff's activities would not be sufficient to constitute doing business in Montana under either the regulatory or service of process statutes. Finally, even under the more liberal rule of International Shoe and similar cases, plaintiff did not have sufficient "minimum contacts" with the State of Montana to uphold either serv-

---

9. See for example Samuels v. Mott, Sup. 1960, 211 N.Y.S.2d 242; Snipes v. Commercial & Industrial Bank, 1955, 225 Miss. 345, 83 So.2d 179; Bahlke v. Byram, D.C.Mun.App., 1951, 78 A.2d 384; Equitable Credit Co. v. Rogers, 1927, 175 Ark. 205, 299 S.W. 747; General Motors Acceptance Corp. v. Shady Side Coal Co., 1926, 102 W.Va. 402, 135 S.E. 272; General Motors Acceptance Corp. v. Lund, 1922, 60 Utah 247, 208 P. 502.

10. This was well expressed by Judge Learned Hand in Bomze v. Nardis Sportswear, 2 Cir., 1948, 165 F.2d 33, 35: "* * * thus the first question is whether the service was valid under the New York decisions. If we conclude that it was not, of course the case ends; but, if we conclude that it was, there arises the second question: i. e. whether the service was valid under the Constitution."

ice of process or denial of right to sue in this state.

I have examined the "similar" cases cited by defendant where it was held that the corporation was doing business in the state. In my opinion, all of them are distinguishable. The case most nearly in point is John Hancock Mutual Life Ins. Co. v. Girard, 1936, 57 Idaho 198, 64 P.2d 254. It is true, as counsel suggest, that there are similarities between that case and the instant case. On the other hand, there are also many dissimilarities, as set forth in the subsequent Idaho case of Land Development Corp. v. Cannaday, 1953, 74 Idaho 283, 258 P.2d 976, where the court said:

"Where a foreign corporation makes a loan and takes a note outside of Idaho, secured by a mortgage upon property in this state, and the entire transaction takes place in such other state, the place fixed for the payment of the note, neither the consummation of the transaction nor a foreclosure of the mortgaged property within this state constitutes doing business in Idaho * * *. (Citing cases.)

"Respondent places great reliance upon the case of John Hancock Mut. Life Ins. Co. v. Girard, 57 Idaho 198, 64 P.2d 254. The court, in that case, did not denounce or depart from the principles set forth in any of the above-cited cases; however, there were many facts and factors found in the Hancock case which readily distinguish it from all of these cases as well as the instant case; in the Hancock case the foreign corporation, through its agent in the State of Idaho, actively secured numerous investments which were evidenced by notes and mortgages made payable outside the state but which did recite on their face that they were executed under and governed by the laws of Idaho; additionally, such agent looked after the collection of principal and interest, the payment of taxes, the procuring of insurance on improvements and secur-

ing renewals from time to time; moreover, the foreign corporation negotiated the extension of the particular loan involved at maturity and secured additional personal liability and obligation from the purchaser of the property subject to the original mortgage given by the predecessor in interest of the purchaser and did at the same time retain the original security; also, the corporation took many deeds in lieu of foreclosure and engaged in the rental and leasing of lands thus obtained, and also in some instances sold and conveyed the lands so acquired, and, in general, managed and developed such property in the furtherance of its business and carried on both agricultural pursuits and a real estate business in such lands so acquired. It transacted a substantial part of its ordinary business, continuous in character, in Idaho. None of these facts or factors appear in the instant case." 258 P.2d at page 979, 980.

Certainly the activities of plaintiff here were not comparable to those in the Hancock case.

■ Although my conclusion that plaintiff was not "doing business in the state" renders further discussion unnecessary, there is an alternative, but closely related ground which compels judgment for the plaintiff. It appears from the stipulated facts that plaintiff was engaged in interstate commerce and that the transactions in question arose out of and are a part of this interstate activity. A state is without power to exact conditions or place burdens upon the exercise of interstate commerce. The Supreme Court of Montana, in the recent case of Union Interchange, Inc. v. Parker, Mont.1960, 357 P.2d 339, 344, recognized this limitation and construed and delimited the Montana statutes accordingly. In that case the plaintiff was a foreign corporation which solicited the purchase of advertising space in its publications. The activities of plaintiff are summarized in the court's opinion as follows:

"The whole operation of plaintiff consists of nine steps: (1) there is a solicitation for customers (conducted by mail from the state of incorporation); (2) the customer responds and invites a salesman to call (by mail, sent to the state of incorporation); (3) a salesman of the plaintiff calls upon the prospective customer, to sell the advertising order (this is the sole activity conducted outside of the state of incorporation); (4) the contract is submitted to the company for acceptance (by mail to the state of incorporation); (5) the contract is accepted (in the state of incorporation); (6) the company processes and handles the account (only in the state of incorporation); and (7) all performance under the contract is completed by the printing and mailing out of the plaintiff's publications (only in the state of incorporation); (8) the obligation is payable to the company at its office (in the state of incorporation); and (9) all offices as well as employees are maintained in the state of incorporation. These activities which result in contractual obligations between citizens of different states constitute interstate commerce."

The court held that, "Plaintiff's activities in this state being interstate commerce, they are not subject to the provisions of section 15–1701."

   Of course the fact that a foreign corporation engages in interstate commerce does not of itself preclude any and all regulation by the states in which it operates. When corporate activities in a particular state become purely local in character they may properly be called "doing business" within that state and as such subject to legitimate state regulation.[11]   Where, however, the activities are incidental to transactions in interstate commerce, they remain within the protection of the commerce clause of the federal constitution.[12]

   The activities of plaintiff in this case were incidental to transactions in interstate commerce and accordingly beyond the scope and power of Montana's corporate regulatory statutes.

Pursuant to Rule 11(b) of the Local Rules of Court, plaintiff will prepare, serve and file draft of judgment.

---

11. See 20 C.J.S. Corporations § 1840, p. 56.

12. In addition to Union Interchange, Inc. v. Parker, supra, see East Coast Discount Corporation v. Reynolds, 1958, 7 Utah 2d 362, 325 P.2d 853.